UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| FREDERIC LEPPER,<br>    Petitioner,<br>v.<br><br>LOIS RUSSO,<br>    Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. 04-11879-MLW |

PETITIONER'S MEMORANDUM OF LAW
IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

ISSUES PRESENTED

1. Whether Lepper was denied his constitutional right to have all facts which may increase the statutory maximum sentence included in the indictment and found by a jury beyond a reasonable doubt?

2. Whether the judge denied Lepper's Sixth Amendment rights by forcing him to go to trial with unwanted representation even though there had been a complete breakdown in communication between Lepper and trial counsel and by not offering him the opportunity to represent himself?

3. Whether trial counsel's failure to introduce substantial exculpatory evidence denied Lepper his right to effective assistance of counsel as guaranteed by the Sixth Amendment of the United States Constitution?

STATEMENT OF THE CASE

The Commonwealth attempted to portray Frederic Lepper's business as a front for a scheme to defraud people throughout New England.  Lepper, owner of Laredo Building Systems, contracted with people to build large storage sheds.  Twenty-two people testified that he or his salesman Charles Hill took a deposit from them but that they did not receive the promised building.  Lepper's defense was that he lacked the intent to commit fraud, but rather he simply was not good at running this business.

1

### A.    The Commonwealth's Case.

#### 1.    The complainant customers.

The typical story testified to by the complainant customers was that a contract was signed and a check representing a one-third deposit was provided to Lepper, but that no building was ever erected.[1]  Seven complainant customers testified that they signed a contract and gave a one-third deposit check to Lepper, receiving at least blueprints for their projects.[2]  One of the complaint customers received blueprint, materials, and a partially completed building (Tr. I: 16-17, 21, 25, 29).  Another received materials and two visits by a work crew (Tr. III: 35-36).  Unfortunately, the workers arrived before the materials and they could not erect the building (Tr. III: 37).  Other complainant customers had similar stories, except that they dealt with Hill, not Lepper.[3]

#### 2.    The salesman's story.

The Commonwealth and Hill entered into a plea agreement that called for Hill's testimony against Lepper (Tr. III: 87).  Hill testified that he had known Lepper since 1995 when they worked together at a car dealership (Tr. III: 141).  In 1997, after both had left the car dealership,

---

[1] This is the story told by James Bowen (Tr. II: 83-84), Brian Cardinal (Tr. II: 104-05, 111), Thomas Hatch (Tr. I: 56, 59), Andre Laliberte (Tr. III: 69-71, 75), and George Murray (Tr. 9/9/99: 100-01, 113).

[2] Raymond Bronner (Tr. I: 38-39, 42-43); Richard Allis (Tr. I: 74-75, 82); Kevin Ducharme (Tr. II: 54, 58-59, 62-63); Trudy Niles (Tr. II: 74, 78); Melvin Williams (Tr. II: 25, 28, 31, 36); Charlene Bostock (Tr. II: 191); and, Steven Winner (Tr. III: 115, 117, 123).

[3] Daniel Lamprey (Tr. I: 98, 100); Richard O'Keefe (Tr. II: 128, 130, 132-33); George Chase (Tr. II: 168-69, 173-76); Gerald Upton (Tr. II: 197, 201, 204); Donald Roussey (Tr. III; 13-14, 16); Kyle Black (Tr. III: 42-44, 47, 49); John Mayo (Tr. III: 128-29, 131); and, William Snide (Tr. III: 171).

Lepper contacted Hill to tell him about his business and ask him to join (Tr. III: 142-144). Hill accompanied Lepper on several sales calls to observe the business (Tr. III: 147). Hill then agreed to work for Lepper on a commission basis. He was to receive 10 percent of the sale price of the buildings, and the payment was to be made from the down-payment received from the customer (Tr. III: 149).

Hill was hired merely as a salesman (Tr. III: 143-45). Hill was not willing to get involved in any aspect of the construction such as ordering materials or arranging crews (Tr. III: 156). Hill thought that Laredo Building Systems was licensed, insured, and bonded (Tr. III: 158-59). Hill sold twenty-seven buildings for Laredo, and was paid for twenty-four (Tr. III: 163). Hill declared the commissions he received on his taxes (Tr. III: 177).

Hill was aware of some of the sources that Laredo purchased its supplies from (Tr. III: 177). He had also met several of the subcontractors and observed them working on several sites (Tr. III: 178-179). He knew of a number of buildings built and that he had seen a few of them (Tr. III: 179-81).

### 3. Documentary evidence.

Massachusetts State Trooper Michael Kondrewicz executed a search warrant at Lepper's residence where Lepper ran the business from (Tr. IV: 15). Mrs. Lepper directed the trooper to a box of documents that she identified as relating to Laredo Building Services (Tr. IV: 18). Numerous contracts, orders for materials, a paid order for lumber, and blueprints found in this box were admitted (Tr. IV: 24-27, 31, 44, 73-74).

Documents were also introduced showing that the Leppers had two bank accounts, one for the business and a personal account (Tr. IV: 40). Checks payable to the Leppers, Hill, and

"Cash," from the business account were admitted (Tr. IV: 41). Kondrewicz testified that they totaled more than $50,000 (Tr. IV: 42). Kondrewicz also testified that approximately $5000 was transferred from the business account to the personal account (Tr. IV: 43). However, a cancelled check indicates just the opposite; the $5000 went from Lepper's personal account into the business account (R.520). Trial counsel did not introduce this check and Kondrewicz's testimony on this point was left unchallenged.

Several documents were admitted that showed purchases of supplies made for other customers. Kondrewicz saw invoices for other jobs, but that he did not visit those sites to see if in fact buildings were complete (Tr. IV: 63-64). Defense counsel specifically asked Kondrewicz about four completed buildings, none of which Kondrewicz had visited. (Tr. IV: 63, 84).

Trial counsel did not present a complete defense as he failed to offer substantial documentary evidence that would have supported the defense. Specifically, trial counsel did not offer canceled checks indicating that Lepper had spent nearly $200,000 on business expenses (R. 195-463). Moreover, trial counsel did not make any effort to organize the existing evidence in a manner that the jury could easily understand through the creation and presentation of financial reports. Rather, trial counsel simply asked the jurors to, "look at the check register" (Tr. IV: 133), and determine through their own investigation that Lepper simply failed in an effort to operate a legitimate business.

### 4. Lepper's Case.

Through cross examination and through the testimony of Susan Lepper, the defense tried to show that Lepper did not intend to defraud people, but that Lepper was a lousy business man whose incompetence was compounded by personal tragedy and poor health.

Four customers testified that they had visited buildings that had been or were being built by Lepper. Lamprey viewed a building that was being built by Lepper in Sturbridge, MA (Tr. I: 91). Bostock saw one completed building by Lepper, in Sturbridge, MA (Tr. II: 191). Niles saw at two buildings in Connecticut (completed) and Southbridge, MA (under construction) (Tr. II: 72). Roussey visited an unspecified building site that was being done by Lepper where he was told that his was the next building to be built (Tr. III: 18).

Mrs. Lepper was the sole defense witness. She testified that in November of 1996, Lepper started the business (Tr. IV: 92). She testified that she would take photographs of some of the completed buildings, and that she had seen about nine of the buildings (Tr. IV: 93-94). She was somewhat involved with the paperwork (Tr. IV: 100-01, 117). Her involvement with the paperwork came about mostly because of her frustration with Lepper's bookkeeping skills (Tr. IV: 101-03).

Mrs. Lepper described problems with the business that were beyond Lepper's control. She recounted an incident where the steel was not delivered and he drove to Virginia to pick up the steel (Tr. IV: 107). She further testified that his crews gave him problems and that he had trouble finding competent help (Tr. IV: 109). Lepper made advance payments to the crews (Tr. IV: 110).

Mrs. Lepper also discussed personal tragedies that struck the Lepper family in 1997. In July, Lepper's brother passed away. In September, their first child was born (Tr. IV: 95). The pregnancy was fine, but the child needed hospitalization for twelve days. Lepper slept every night at the hospital (Tr. IV: 96-97).

During this time, the Leppers began arguing about finances and the business. Mrs. Lepper

threatened to leave him if he did not shut down the business or make it work (Tr. IV: 103-04). One fight culminated in Lepper being hospitalized overnight and then forced to rest for a week on doctor's orders due to chest pains (Tr. IV: 103-05).

## ARGUMENT

**I.  LEPPER WAS DENIED HIS CONSTITUTIONAL RIGHT TO HAVE ALL FACTS WHICH MAY INCREASE THE STATUTORY MAXIMUM SENTENCE INCLUDED IN THE INDICTMENT AND FOUND BY A JURY BEYOND A REASONABLE DOUBT.**

In rejecting Lepper's claim under Apprendi v. New Jersey, 530 U.S. 466 (2000), the Massachusetts Appeals Court wrote, "[Lepper's] sentencing alone avoids any Apprendi violation." Commonwealth v. Lepper, 60 Mass. App. Ct. 36, 48-49 (2003). The Appeals Court continued that there was no error because Lepper could have received consecutive sentences on the individual counts totaling more time than he received as a common and notorious thief. Id. Thus, the judgment of the state court affirming the defendant's sentence is "contrary to" Supreme Court precedent as the state court made a statement of law inconsistent with a statement made by the Supreme Court and because the state court decided a case with "materially indistinguishable facts" differently from the Supreme Court. Williams v. Taylor, 529 U.S. 362, 413 (2000).

Apprendi announced what Justice O'Connor appropriately termed "a watershed change in constitutional law." Apprendi, 530 U.S. at 524 (2000) (O'Connor, J., dissenting). The most-often cited passage of the Supreme Court's ruling is that: "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. Immediately following that passage, though, the Court set forth a "statement of the rule" that it was endorsing:

It is unconstitutional for a legislature to remove from the jury the assessment of

facts that increase the prescribed range of penalties to which a criminal defendant
is exposed. It is equally clear that such facts must be established by proof beyond
a reasonable doubt.

Id., quoting, Jones v. United States, 526 U.S. 227, 252-53 (1999) (opinion of Stevens, J.). The Supreme Court grounded its opinion in the due process clause and the Sixth Amendment right to jury trial. Id. at 476-77.

The defendant, in Apprendi, pleaded guilty to three counts of an indictment. The defendant received an enhanced sentence on a single count based on the judge's finding that the crime involved racial bias. Although the sentence imposed on the single count (twelve years) was higher than the default statutory maximum for that count (ten years), it was less than the maximum sentence (twenty years) that the defendant could have received had the judge imposed consecutive sentences on the three counts of conviction, even with no finding of racial bias. Apprendi, 530 U.S. at 470-71.

New Jersey argued in Apprendi that there was no constitutional error because the defendant could have received the same sentence via consecutive sentences without a finding of racial bias. In rejecting the state's argument, the Supreme Court wrote:

> It is appropriate to begin by explaining why certain aspects of the case are not
> relevant to the narrow issue that we must resolve. First, the State has argued that
> even without the trial judge's finding of racial bias, the judge could have imposed
> consecutive sentences on counts 3 and 18 that would have produced the 12-year
> term of imprisonment that Apprendi received; Apprendi's actual sentence was thus
> within the range authorized by statute for the three offenses to which he pleaded
> guilty. Brief for Respondent 4. The constitutional question, however, is whether
> the 12-year sentence imposed on count 18 was permissible, given that it was above
> the 10-year maximum for the offense charged in that count. The finding is legally
> significant because it increased -- indeed, it doubled -- the maximum range within
> which the judge could exercise his discretion, converting what otherwise was a
> maximum 10-year sentence on that count into a minimum sentence. The sentences
> on counts 3 and 22 have no more relevance to our disposition than the dismissal of
> the remaining 18 counts.

Apprendi, 530 U.S. at 474. The material procedural facts of Apprendi are indistinguishable from the instant case.

In the instant case, Lepper was convicted of twenty-three larcenies. The indictments include no reference to the common and notorious thief statute and the issue of whether they were distinct from one another was not submitted to the jury. Based on the judge's factual finding that a particular larceny was distinct from at least two others, the maximum sentence on the count increased from five years under G.L. c. 266, § 30 to twenty years under G.L. c. 266, § 40. Lepper then received an enhanced sentence based on the judge's finding that the larcenies were distinct and that therefore Lepper was a common and notorious thief (see docket sheet which lists the sentence of ten to fifteen years in connection with each count of larceny). Thus, in the case at bar just as in Apprendi, the sentence imposed was higher than the default maximum for any of the individual larcenies, but less than the total aggregate sentence that could have been imposed. The decision of the Massachusetts Appeals Court rejecting the defendant's constitutional claim because the sentence he received was less than the total aggregate sentence he could have received is contrary to the Supreme Court's decision in Apprendi.

In order to be adjudicated a common and notorious thief, a defendant must have been "convicted at the same sitting of the court, as principal or accessory before the fact, of three distinct larcenies." G.L. c. 266, § 40. If the larcenies are not distinct, the defendant faces a maximum sentence of five years on each larceny. G.L. c. 266, § 30. However, if the larcenies are found to be distinct, the defendant faces a maximum sentence of twenty years. G.L. c. 266, § 40. Thus, whether the larcenies are distinct is a factual question that may increase the default statutory maximum on any given larceny charge. Accordingly, under Apprendi, the question of

whether the larcenies are distinct or not must be included in the indictment and found by the jury beyond a reasonable doubt. Apprendi, 530 U.S. at 490. Moreover, the statute is unconstitutional on its face as it allows a defendant convicted of three larcenies to have the statutory default increased from an aggregate maximum of fifteen to a maximum of twenty years.

Although there is not a significant amount of jurisprudence directed at the common and notorious thief statute, the existing law indicates that issue of distinctness is a factual question: it is not simply a matter of counting guilty verdicts. The Massachusetts Supreme Judicial Court has held that "successive takings of property actuated by a single, continuing criminal impulse or intent or pursuant to a general larcenous scheme may, but need not, be charged as one crime." Commonwealth v. Murray, 401 Mass. 771, 774 (1988). For instance, the Supreme Judicial Court went further has ruled that it would be appropriate for a defendant who had established a phony night deposit box to only be convicted of a single larceny even though seven individuals had made deposits. Commonwealth v. Donovan, 395 Mass. 20, 27-28 (1985). Other cases, dating back to before the Civil War, recognize that distinctness is a factual question that is open to argument in any given case. See e.g. Stevens v. Commonwealth 45 Mass. 360, 364-65 (1842) (court must look to facts of the larcenies to determine whether they are distinct; Commonwealth v. Crocker, 384 Mass. 353, 356 n. 5 (1981); Commonwealth v. Lane, 25 Mass. App. Ct. 1002, 1003-04 (1988) (scheme to rent the same apartment to as many people as possible)

Before the seminal Apprendi decision, the Massachusetts Supreme Judicial Court found that the common and notorious thief statute did not violate the Sixth Amendment. Crocker, 384 Mass. at 355. One of the points made by the court in Crocker was that the defendant could have been given consecutive sentences on the larcenies to obtain the same sentence he received as a

common and notorious thief. In light of Apprendi, Crocker is no longer good law. First, Apprendi directly contradicts the basic holding of Crocker. Second, Apprendi states that a defendant may not receive a sentence greater than the statutory maximum for a particular statute even if the same ultimate sentence could be obtained by aggregating the sentences where there are multiple convictions. Apprendi, 530 U.S. at 469-70 and 474-75. See also, United States v. Jones, 235 F.3d 1231, 1238 (10th Cir. 2000) (court may not find Apprendi error harmless on the ground that the same sentence could have resulted from imposing consecutive sentences on separate counts).

Imposing a sentence of ten to fifteen years on each of the larceny charges violated Lepper's Sixth Amendment right to have all critical facts included in the indictment and found by the jury. Accordingly, the sentence imposed must be vacated, and Lepper must be sentenced in a non-vindictive manner.

**II.     THE JUDGE DENIED LEPPER'S SIXTH AMENDMENT RIGHTS BY FORCING HIM TO GO TO TRIAL EVEN THOUGH THERE HAD BEEN AN IRRECONCILABLE BREAKDOWN OF THE ATTORNEY/CLIENT RELATIONSHIP AND BY NOT OFFERING HIM THE OPPORTUNITY TO REPRESENT HIMSELF.**

The Massachusetts Appeals Court denied Lepper's claim that the trial judge erred in neither appointing substitute counsel for Lepper nor offering him the opportunity to represent himself on the grounds that this issue was raised for the first time on appeal and applied the standard for procedurally defaulted claims - whether there was a substantial miscarriage of justice. Lepper, 60 Mass. App. Ct. at 53-54; Commonwealth v. Freeman, 352 Mass. 556, 563-64 (1967) (standard of review for procedurally defaulted claims is whether the alleged error gave rise to a substantial risk of a miscarriage of justice). As this claim was not adjudicated on the merits, this

Court must apply the pre-AEDPA standard of review which accords no deference to the state court's resolution of a federal constitutional issue. See Medellin v. Dretke, 544 U.S. 660, ___; 125 S.Ct 2088. 2099-2100 (2005) (Ginsburg, J. concurring). The pre-AEDPA standard of review of the defendant's claim that he was denied his Sixth Amendment rights is *de novo*. Lavallee v. Coplan, 374 F.3d 41, 44 (1st Cir. 2004) (claims not adjudicated on the merits in the state court proceedings are reviewed *de novo*); see also, Williams, 529 U.S. at 400 (opinion of O'Connor, J.) (pure questions of law and mixed questions of law and fact were reviewed *de novo*), citing, Miller v. Fenton, 474 U.S. 104, 112 (1985).

The Sixth Amendment of the United States Constitution grants a criminal defendant the right to represent himself in proceedings against him. Faretta v. California, 422 U.S. 806, 819 (1975). If a defendant chooses to forego the services of defense counsel and act on his own behalf, the state cannot compel him to accept a lawyer he does not want. Id. at 883. Counsel that is thrust upon the accused becomes "an organ of the State interposed between an unwilling defendant and his right to defend himself personally." Id. at 820. Just like the right to counsel of choice, the right of self-representation is an end itself. The depravation of this right cannot be harmless. See United States v. Panzardi-Alvarez, 816 F.2d 813, 818 (1st Cir. 1987).

The Sixth Amendment also requires the appointment of substitute counsel, even in the midst of a trial, if the defendant can show good cause such as a conflict of interest, a breakdown in communication or an irreconcilable dispute with his attorney. United States v. Panzardi Alvarez, 816 F.2d 813, 816 (1st Cir. 1987).

In this case it was readily apparent that there had been a complete breakdown in communication between Lepper and trial counsel. The judge abused his discretion in neither

replacing trial counsel nor inquiring whether Lepper's unequivocal statement, "I don't want him for counsel" (Tr. II: 17), was a knowing and intelligent waiver of his right to counsel.

When the case was called for jury selection, Lepper voiced his dissatisfaction with the way trial counsel had prepared for trial (Tr. 9/9/99: 14). The judge found that trial counsel was prepared for trial. That morning a jury was selected, the opening statements were made, and a single witness testified.

Upon returning from the lunch break, Lepper again complained about trial counsel, stating "Me and my attorney are fighting like cats and dogs over this case." (Tr. I: 4). Lepper asked, *pro se*, for a mistrial based on trial counsel's failure to cross examine the prosecution witnesses and failure to present exculpatory evidence. The judge declined the request stating, "My assessment of [trial counsel] he's doing a good, workman like job with a very, very difficult case" (Tr. I: 4-5).

The following morning, Lepper registered his dissatisfaction with trial counsel for the third time. Lepper also made a second *pro se* motion for a mistrial and told the court that he did not want trial counsel to represent him (Tr. II: 15-17). Lepper informed the judge that he and counsel were "bumping heads," that the trial counsel had told him he "was a bullshitter and guilty," and that he felt he did not have proper counsel for the case (Tr. II: 16-17). The judge replied, in part, "the manner in which he's conducting the trial, I think he's doing a good job, from what I observed." (Tr. II: 17). Lepper then stated, unequivocally, "I don't want him for counsel" (Id.). The judge denied the *pro se* motion for mistrial, called the jury in, and proceeded with the trial (Id.).

The docket reveals that at some point during the second day of trial – apparently with no hearing – the judge denied a motion to withdraw filed by trial counsel on the grounds that 1)

Lepper had lied about trial counsel, and 2) Lepper was not cooperating with trial counsel (R. 5, 92). It is an abuse of discretion to deny a motion to withdraw without any form of a hearing. See United States v. Prochilo, 187 F.3d 221, 223-24 (1st Cir. 1999).

Lepper's repeated expressions that he did not feel that trial counsel was prepared, that trial counsel was not following his instructions relating to trial, his unequivocal statement "I don't want him for counsel" combined with trial counsel's alleging to the judge that Lepper was lying to the court and not cooperating demonstrates that there was a breakdown in communication or an irreconcilable dispute with trial counsel requiring either the appointment of substitute counsel or a colloquy of Lepper to confirm his desire to waive his right to counsel and proceed *pro se*.

### III. TRIAL COUNSEL'S FAILURE TO INTRODUCE SUBSTANTIAL EXCULPATORY EVIDENCE DENIED LEPPER HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION.

In this case, trial counsel's performance was constitutionally deficient in that he failed to introduce significant exculpatory evidence that was in his trial file.[4] The Massachusetts's courts rejected Lepper's claim that he did not receive effective assistance of counsel. It does not appear that the Massachusetts Appeals Court adjudicated the merits of the federal aspect of this issue as it neither cited any federal cases not recited the appropriate standard of review applicable to the federal claim. Commonwealth v. Lepper, 60 Mass. App. Ct. 36, 50 (2003). Thus, the appropriate standard of review for this issue is *de novo*. Lavallee, 374 F.3d at 44. To the extent

---

[4] Trial counsel also failed to notice that the judge had failed to instruct the jurors on the age requirement on certain indictments alleging larceny from a person over sixty (Tr. V: 27). The judge *sua sponte* realized his mistake and entered a verdict of guilty on the lesser charge of larceny. As the judge corrected his own error, the defendant was not prejudiced by this mistake. However, this is another example of counsel's deficient performance.

that the state court adjudicated the merits of Lepper's claim, the decision is "contrary to" and an "unreasonable application of" Supreme Court precedent.

The Sixth Amendment of the Constitution of the United States guarantees the right of a criminal defendant to effective assistance of counsel at each critical stage of the proceedings. The test for determining whether that right has been violated is whether 1) counsel's representation fell below an objective standard of reasonableness, and 2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding could have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).

The state court makes no mention of that test, but simply found that the defendant suffered no "material prejudice." Lepper, 60 Mass. App. Ct. at 53. The Massachusetts Appeals Court quoted the trial judge who wrote, in rejecting Lepper's claim of ineffective assistance of counsel in a motion for new trial, that, "with one hundred and twenty-one exhibits on their hands, the jurors were armed with sufficient information on which to reach a fair result." (R. 543). In so doing, the state court decision makes the same mistake that the Supreme Court found to be both contrary to and an unreasonable application of Supreme Court precedent. Williams, 529 U.S. at 391.

In Williams, the state court rejected a claim of ineffective assistance of counsel for failure to introduce exculpatory evidence on the ground that regardless of counsel's performance, the trial was fundamentally fair. Id., at 393-94. The application of the wrong legal standard is both contrary to and an unreasonable application of Supreme Court precedent. Id., at 397. The state court made the same mistake in the instant case. The ruling that there was no ineffective assistance of counsel because, "the jurors were armed with sufficient information on which to

reach a fair result" is more than just wrong. It is unreasonable.

That ruling is unreasonable as it reveals that the state court did not apply the Strickland standard to Lepper's claim. Moreover, the state court failed to consider the exculpatory nature of the available evidence that trial counsel failed to present. The ruling also fails to appreciate that the defendant has a right to present all exculpatory evidence. Washington v. Texas, 388 U.S. 14, 19 (1967) (the basic right to present a complete defense is a fundamental component of a fair trial). The sheer number of exhibits is not relevant to this issue. What is important is that Lepper's right to present a complete defense was violated by trial counsel's failure to present substantial exculpatory evidence that was in his possession.

Trial counsel presented a bare-bones defense that Lepper ran a failing business and he did not intend to commit any larcenies. In support of this he admitted the business check register, then asked the jurors to look through it. Trial counsel had the actual canceled checks in his file (R. 160, 195-463). Counsel also had a canceled check indicating that $5000 had been deposited into the business account from the Lepper's personal account (R. 520). Trial counsel had the right to introduce the checks and should have done so. Moreover, the judge had previously indicated that all records relating to the business were admissible (Tr. IV: 45).

Rather than introduce the actual checks, trial counsel introduced Lepper's check register. Trial counsel's failure to go further and admit the actual checks prejudiced Lepper in two key respects. First, the check register is simply Lepper's notation of the amount of the check, the date of the check, and to whom it was made out. However, the register is not proof of anything. There is no indication of when the register was written, except that it was before it was seized by the police. More important, without the actual checks there was no corroboration indicating that

the check was made out to the person listed as the payee or that the payee ever received the check. The canceled checks — combined with the bank statement already in evidence — are strong evidence that each check was made out to a particular payee and that the payee actually received the money.

Second, the check register is far from complete. There are nearly fifty checks for which the register either lists only a dollar amount or is completely blank.[5] The total value of these checks is $52,220. The jurors had heard how much Lepper paid himself, his wife, and Hill. They should have heard how much he spent trying to run the business. Had counsel introduced the actual checks, he would have been in a position to organize the mountains of documents that had been introduced to paint a complete picture of Lepper's business to the jury. The defendant organized and presented the information contained on the cancelled checks in connection with his motion for new trial in the form of three reports (cash flow R.465; totals to each payee R.478-79; chronological transaction report R.494-502). It took approximately six to eight hours with the benefit of a computer to generate these reports (R. 160).

This case turned on whether the jury believed that Lepper ran a failing business or if they believed that he intended to defraud a series of customers. Understanding how much money was taken in and expended by the business is critical to properly evaluating Lepper's intent. Trial

---

[5] The following list of forty-eight checks for which the register was missing important information uses the shortened citation format - check number: record appendix page.  1084:275, 1113:304, 1115:306, 1117:308, 1122:312, 1135:325, 1137:327, 1138:328, 1142:332, 1143:333, 1146:336, 1147:337, 1148:338, 1150:340, 1151:341, 1154:343, 1155:344, 1160:348, 1179:367, 1181:368, 1184:371, 1192:379, 1193:380, 1195:382, 1197:384, 1203:390, 1210:396, 1213:399, 1218:404, 1219:405, 1220:406, 1221:407, 1223:409, 1224:410, 1226:412, 1243:426, 1245:428, 1246:429, 1253:435, 1257:438, 1258:439, 1259:440, 1260:441, 1261:442, 1263:444, 1264:445, 1273:451, 1290:462

counsel had the means to present this crucial information to the jurors: he failed to deliver.

Presenting a cash flow report, a report showing the totals paid to each payee, and a chronological transaction report to the jury would have provided strong support for trial counsel's theory of defense. The jurors had been told by the prosecutor that Lepper and his wife received approximately $50,000 from the business. They were never informed that the business spent nearly $200,000 on other legitimate business expenses including, *inter alia*, $100,574 on building supplies and materials, $50,034 on labor, nearly $8,000 on architects, and more than $11,000 in refunds to other customers (R. 465). This information would have answered the question that was likely on the jurors' minds about where the money went. Based on the Commonwealth's presentation of the case, it appeared that Lepper, his wife and Hill pocketed nearly all the money received from the complainant customers. However, that was not the case. Counsel's failure to present exculpatory evidence or organize the existing evidence prevented the jurors from seeing the true nature of the business.

Trial counsel's failure to present a full defense in an organized fashion was also prejudicial in that for the complainant witness who had received a partial building, Lepper spent more on blueprints, supplies and labor than he received from the customer (R. 504-509).

Trial counsel also failed challenge the testimony of a Commonwealth witness that Lepper transferred $5000 from the business account to his personal account by introducing the canceled check showing that $5,000 was actually taken from Lepper's personal account and deposited into the business account (R. 520). In addition the bank statements show $845.00 in transfers into the business account (R.187, 189). The Commonwealth relied on the amounts of money paid to the Leppers as evidence of intent to commit fraud. Trial counsel should have countered this with

evidence of actual business expenses incurred and transfers into the business accounts.

    The introduction of the cancelled checks and the presentation of reports such as those discussed at page 16, *supra*, would have also bolstered the closing argument. The closing argument is one of the most critical elements of the constitutional right to a trial. The closing argument represents, "'the opportunity finally to marshal the evidence' in his favor and 'to sharpen and clarify the issues for resolution by the trier of fact'" Id., at 675, quoting Herring v. New York, 422 U.S. 853, 862 (1975). Trial counsel missed this opportunity.

    Having decided to defend the allegations on the ground that there was no intent to defraud, but rather, Lepper simply poorly ran his business, trial counsel should have forcefully pursued that defense in his closing argument. Trial counsel's closing came up short because he offered no answer to the first question that was probably on each juror's mind - what happened to the money. Trial counsel made a bare bones argument that the business ran into trouble, it fell behind, had trouble with the work crews, etc. Trial counsel also asked the jurors to look at the register and notice that there were checks made out to various people. That simply is inadequate given the complexity of this case. Had counsel introduced the cancelled checks and prepared financial reports from the business, trial counsel could have told the jurors exactly what had happened to the money.

    Trial counsel offered no explanation as to what happened to the deposits paid by each of the twenty-two customers who came to court and testified that they gave a deposit and did not receive the building they contracted for. This is a glaring omission that could have been filled had trial counsel simply organized the mountains of documents that were introduced at trial and introduced a few exculpatory exhibits. Specifically, trial counsel should have gone through the

evidence and come up with the total amounts that were paid to the various crew members, the total amount paid for supplies and building materials, the total amounts that were refunded to other customers. It was simply inexcusable to leave this daunting task to the jurors.

Trial counsel's failure to introduce exculpatory evidence or explain the exculpatory nature of the existing evidence falls below an objective standard of reasonableness and there is a reasonable probability that the result of the proceeding would have been different.

## CONCLUSION

The constitutional errors discussed above in Argument II and III require this court to vacate the convictions and remand to the state court for a new trial. The error in sentencing Lepper beyond the statutory maximum discussed above in Argument I requires this court to vacate the sentence and remand to the state court for re-sentencing.

FREDERIC LEPPER
By his attorney,


 /s/ Alan D. Campbell
Alan D. Campbell
B.B.O. No. 634188
P.O. Box 131
Brookline, MA 02446
(617) 735-8913

Dated: May 8, 2006

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on May 8, 2006

 /s/ Alan D. Campbell
Alan D. Campbell